**LIFELINE LIMITED NO. II, an Illinois limited partnership, Plaintiff,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Delaware corporation, Preferred Health Care Corp., a Delaware corporation, Joseph L. Posch, Jr., an individual, and James Kinville, an individual, jointly and severally, Defendants.**

No. 92–CV–74752.

United States District Court, E.D. Michigan, S.D.

July 22, 1993.

---

**440**

Edward M. Kalinka, Robert A. Boonin, Sheldon H. Klein, Butzel Long, Detroit, MI, for plaintiff.

William A. Sankbeil, Joanne Geha Swanson, Kerr, Russell and Weber, Detroit, MI, for defendant.

Elaine Temesan, Schafer & Weiner, P.C., Birmingham, MI, for Joseph L. Posch, Jr.

Vivian Perry–Johnston, Dickinson Wright, Bloomfield Hills, MI, for Preferred Health/James Kinville.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. *Introduction*

#### A. Procedural History

Plaintiff Lifeline Limited No. II ("Lifeline") has filed a Second Amended Complaint against defendants Connecticut General Life Insurance Company ("Conn Gen"), Preferred Health Care Corporation ("PHC"), and James Kinville ("Kinville")[1] alleging one claim of promissory estoppel and one claim of fraudulent misrepresentation. In plaintiff's original Complaint, it alleged one count of restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C., and two counts of tortious interference with business expectan-

cy. In an Opinion and Order dated March 15, 1993, I dismissed plaintiff's antitrust claim for failure to state a claim upon which relief could be granted. *See Lifeline Limited No. II v. Connecticut General Life Insurance Co.*, 821 F.Supp. 1201 (E.D.Mich.1993). In an Opinion and Order dated April 12, 1993, I dismissed plaintiff's claims of tortious interference for failure to state claims upon which relief could be granted. *See Lifeline Limited No. II v. Connecticut General Life Insurance Co.*, 821 F.Supp. 1213 (E.D.Mich. 1993). Subsequently, I allowed plaintiff to file a Second Amended Complaint, upon which defendants' current motion to dismiss is based.

For the reasons set forth below, I DENY defendants' May 10, 1993, motion to dismiss Second Amended Complaint.

#### B. Undisputed Facts

Defendant Conn Gen is under contract with non-party General Motors Corporation ("GM") to perform certain delegated administrative functions on behalf of and as agent for GM as the plan administrator of the GM benefit plan ("plan"). Such a plan is an employee welfare plan as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 *et seq.* Conn Gen administers the GM substance abuse benefit plan; GM employees and their dependents are beneficiaries under the benefit plan. As an agent for GM, Conn Gen contracts with health care providers who render the substance abuse treatment ("contract providers").

Defendant PHC is under contract with GM to perform the service of reviewing and assessing proposed contract providers; PHC does not perform the actual contracting with plan providers. PHC recommends to Conn Gen those health care providers with whom Conn Gen should contract. Defendant Kinville is an employee of PHC and is in charge of administering the substance abuse benefits program for GM. Dr. Joseph L. Posch, Jr. ("Posch") is president and chief executive officer of non-party Doctors Hospital.

---

1. Plaintiff's Second Amended Complaint does not contain any new allegations against Dr. Joseph L. Posch, Jr.; thus, there are no pending claims against him.

Plaintiff Lifeline provides in-patient treatment for persons addicted to cocaine and other chemicals. Lifeline is an Illinois limited partnership with its principal place of business in Illinois. Lifeline subcontracts with health care providers who are contract providers. Doctors Hospital, a contract provider, was the facility through which Lifeline last provided service under the benefit plan. Prior to Doctors Hospital, Lifeline subcontracted to provide substance abuse treatment at non-party Kern Hospital beginning in April 1987, changed to non-party Northwest General Hospital in April 1988, and then transferred to Doctors Hospital after June 1990. Lifeline's relationship with Doctors Hospital ended in May 1992. After the termination of the Lifeline/Doctors Hospital relationship, Doctors Hospital continued as a contract provider.

Meanwhile, in June 1991, Lifeline contracted with non-party Michigan Health Center ("MHC") to perform treatment at that facility knowing that MHC was not a contract provider. Even though Lifeline was continuing to provide in-patient substance abuse treatment at Doctors Hospital, it sought to have MHC approved as a contract provider. At the time Lifeline terminated its relationship with Doctors Hospital, it knew that MHC had not been approved as a contract provider. MHC is still not a contract provider.

Defendants do not contract directly with plaintiff Lifeline. Instead, the defendants contract with a contract provider, such as Doctors Hospital. It is the contract provider which contracts with Lifeline. *See Lifeline Limited No. II v. Connecticut General Life Insurance Co.,* 821 F.Supp. 1213 (E.D.Mich. 1993).

### C. Plaintiff's Allegations

#### 1. *Promissory Estoppel*

In its Second Amended Complaint, plaintiff alleges the following with regard to its claim of promissory estoppel:

Lifeline alleges that during the spring of 1992, James Butler ("Butler"), an employee of Lifeline, had many conversations with Thomas Sakorafis ("Sakorafis") of Conn Gen and with Kinville of PHC. Lifeline says that both Sakorafis and Kinville told Butler that if the substance abuse program at Doctors Hospital went out of business, then MHC would be approved as a contract provider. Second Amended Complaint, p. 13.

During a May 20, 1992, telephone conversation between Butler and Kinville, it is alleged Kinville said that PHC controlled approval of the GM substance abuse program administered by Conn Gen and that he was therefore speaking on behalf of both PHC and Conn Gen. Kinville, allegedly, unequivocally promised that if the substance abuse program at Doctors Hospital went out of business, then MHC would be approved as a contract provider and that the Michigan Health Center/Lifeline unit would be authorized to treat beneficiaries of the GM plan. The only contingency allegedly placed on this promise was that Doctors Hospital must no longer be offering its substance abuse program in order for the Lifeline approval at MHC to go forward. Lifeline claims it placed its trust in this commitment. On May 22, 1992, Butler then sent a letter to Kinville confirming the content of the telephone call. In this letter, Butler wrote to Kinville: "[I]f I have left anything out or in any way misstated the situation, please do not hesitate in contacting me." Exhibit B attached to Second Amended Complaint. Kinville allegedly never contacted Butler to dispute or withdraw his promise of approval for the Lifeline program at MHC. Second Amended Complaint, pp. 14–15.

Plaintiff alleges this promise was material. Approval at the Lifeline program at MHC would result in income of $4,050.00 per day for Lifeline. Second Amended Complaint, p. 15.

Lifeline contends that when it received commitment from the defendants that MHC would be approved as a contract provider once Doctors Hospital's substance abuse treatment program went out of business, Lifeline began phasing out its program at Doctors Hospital. Doctors Hospital, which was in bankruptcy at the time, sought to reject its contract with Lifeline. Doctors Hospital's major secured creditor, the Board of Trustees of the Policemen and Firemen

Retirement System of the City of Detroit, objected to the rejection of the Lifeline contract. The debt owed by Doctors Hospital to this secured creditor was so massive that this creditor could have forced Doctors Hospital to keep the Lifeline contract. Thus, Lifeline had the option to reconciliate with Doctors Hospital, and the secured creditor could have forced Doctors Hospital to continue to work with Lifeline. However, in reliance upon defendants' promise, plaintiff allegedly told the secured creditor it would not continue to work with Doctors Hospital. Consequently, allegedly, the secured creditor reluctantly withdrew its objection to the rejection of the contract between Lifeline and Doctors Hospital; Doctors Hospital was authorized to reject the Lifeline contract and did so. Had Lifeline not received the promise from defendants, allegedly it never would have let its contract with Doctors Hospital be rejected; Lifeline, allegedly, would have remained at Doctors Hospital and continued to treat GM patients there under their union plan. Second Amended Complaint, p. 16.

The Lifeline contract with Doctors Hospital was rejected on July 23, 1992. Doctors Hospital went out of business on August 28, 1992. The closing of Doctors Hospital fulfilled the only condition allegedly specified by defendants: once Doctors Hospital stopped treating substance abuse patients, MHC would be approved as a contract provider, and due to Lifeline's contract with MHC, Lifeline would be able to treat beneficiaries of the GM plan at MHC. However, defendants allegedly refused to approve MHC, reneging on their promise. Such reneging, allegedly, has cost Lifeline lost income of $4,050.00 per day. Second Amended Complaint, pp. 16–17.

### 2. Fraudulent Misrepresentation

In its Second Amended Complaint, plaintiff alleges the following with regard to its claim of fraudulent misrepresentation:

Plaintiff claims that the alleged promise, as explained in the promissory estoppel claim, was a false material misrepresentation. At the time defendants made their misrepresentation, they had no intention of keeping their promise to approve MHC as a contract provider once Doctors Hospital went out of busi-

ness. Defendants wanted Lifeline to stay at Doctors Hospital until it went out of business so that Lifeline could go out of business. Defendants wanted Lifeline to go out of business because of its patient advocacy. Second Amended Complaint, p. 19.

Defendants allegedly intended that Lifeline act upon their false promise. Lifeline allegedly did act in reliance upon their misrepresentation. As explained in the promissory estoppel claim, Lifeline's reliance upon defendants' misrepresentation permitted Doctors Hospital to reject the Lifeline contract. Defendants' misrepresentation has resulted in Lifeline losing daily income of $4,050.00.

## II. Analysis

### A. Promissory Estoppel

The elements of promissory estoppel are: (1) a promise, (2) that the promisor reasonably should have expected to induce action of a definite and substantial character on the part of the promisee; (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances requiring that the promise be enforced if injustice is to be avoided.

*Parkhurst Homes, Inc. v. McLaughlin*, 187 Mich.App. 357, 360, 466 N.W.2d 404 (1991).

### 1. Promise

Because promissory estoppel substitutes for the consideration required to form a contract, the promise on which a promissory estoppel action is brought must be definite and clear. *State Bank of Standish v. Curry*, 442 Mich. 76, 85, 500 N.W.2d 104 (1993).

Defendants argue that the alleged promise was nothing more than a general response to a hypothetical question. Defendants argue the promise lacks definiteness with respect to its duration. On May 20, 1992, plaintiff asked Kinville: If Doctors Hospital closed, would Lifeline's program at MHC be approved? At the time the question was posed, Lifeline was operating at Doctors Hospital; thus, a complete closure of Doctors Hospital at that time would have left current patients in an uncertain status. De-

fendants argue Kinville's response was given in a specific context: had Doctors Hospital closed on May 21, 1992, defendants might have agreed to contract with MHC (where Lifeline was already operating). Such a hypothetical situation never occurred. Doctors Hospital did not close until August 28, 1992. During these three months, defendants concluded that a significant over-bedding situation existed among GM plan providers in the Detroit metropolitan area, and Lifeline also began its lawsuit against the defendants. Under these circumstances, argue defendants, the promise could not reasonably still be considered open.

However, this argument by defendants appears to mix the requirements of an offer in a normal bargained-for contractual situation in which consideration is required with the requirements of a promise in a promissory estoppel situation.

Plaintiff says that Kinville's promise to Butler that the Lifeline program at MHC would be approved when Doctors Hospital's substance abuse program was closed was a clear and definite promise, which was confirmed in a follow-up letter. For example, in *Curry*, a farmer discussed with his bank a loan for the upcoming planting season and asked whether he would continue to be supported by the bank as in the past. The bank officers stated that the bank would continue to support him, although they did not guarantee support for the following year. As vague as this promise was, the Michigan Supreme Court held that the evidence was sufficient for a jury to conclude that the bank made a clear and definite promise. *Curry*, 442 Mich. at 90, 500 N.W.2d 104. The court stated:

> Variables such as the nature of the relationship between the parties, the clarity of the representation, as well as the circumstances surrounding the making of the representation, are important to the determination of whether the manifestation rises to the level of a promise.

*Curry*, 442 Mich. at 86, 500 N.W.2d 104.

Plaintiff says the parties have known and done business with each other since 1987. In each instance, defendants approved a new hospital, where Lifeline was operating its program, as a contract provider after Lifeline stopped treating GM patients at a former contract provider hospital. In May 1992, Kinville—consistent with established practice—allegedly promised that MHC (where Lifeline was already operating a program) would receive contract provider status once the existing program at Doctors Hospital ceased.

Based on the allegations and arguments made by plaintiff, I hold that the circumstances leading up to the promise allow a reasonable fact finder to determine if the promise was clear and definite.

### 2. *Reliance*

■ Defendants argue that in light of the allegations made by plaintiff, it is implausible that plaintiff would have relied upon anything said by Kinville, PHC, or Conn Gen. The Second Amended Complaint repeatedly states that defendants expressed animus against plaintiff, defendants sought retaliation against plaintiff for patient advocacy, and defendants had heated arguments with plaintiff. *See, e.g.*, Second Amended Complaint, pp. 7 and 11.

Defendants note that plaintiff also alleges a relationship of trust developed between plaintiff and defendants over the course of dealings with each other. Second Amended Complaint, p. 12. Defendants say it is inconceivable that in this alleged air of hostility that Lifeline would and did place its trust in the defendants' commitment.

Lifeline argues it did not perceive its relationship with defendants to be adversarial at the time the promise was made, and thus its reliance was reasonable. It was only after defendants made their promise and then reneged that Lifeline learned of their animosity, claims plaintiff.

It is for a reasonable fact finder, and not for me on a motion to dismiss, to determine the credibility of trust allegedly placed by plaintiff in defendants' alleged statements.

Further, defendants argue that after the alleged May 20, 1992, promise was made, Lifeline opposed rejection of its contract with Doctors Hospital on June 12, 1992, in U.S. Bankruptcy Court; supposedly Lifeline did

not agree to the rejection of its contract with Doctors Hospital as it contends in its Second Amended Complaint. Thus, argue defendants, Lifeline did not rely on the promise because it objected to the cessation of its contract with Doctors Hospital.

However, Lifeline may not have been objecting to the rejection of its contract with Doctors Hospital; rather, Lifeline could have been objecting to the improper claim for money requested by Doctors Hospital. A reasonable fact finder could decide that Lifeline filed its objection in bankruptcy court because Doctors Hospital was attempting to summarily extract money from Lifeline to which the hospital was not entitled by using bankruptcy procedures improperly. For example, Lifeline's response to Doctors Hospital's bankruptcy motion stated:

> The Order which Doctors Hospital submitted with its Motion provides for an accounting and turnover of the funds which are in Lifeline's possession and which are subject to Lifeline's right of setoff. Consequently, the proposed Order may not be entered. In addition, Doctors Hospital is attempting to obtain relief through an improper procedure. Its Motion to Reject the Executory Contract may not be coupled with a demand for recovery of money....
>
> WHEREFORE, Lifeline objects to entry of the Order proposed by Doctors Hospital because it would impermissibly interfere with Lifeline's right to setoff mutual post-Petition obligations....

Exhibit B to defendants' brief.

Further, defendants argue that the allegation that Lifeline would have remained at Doctors Hospital had defendants not made their alleged promise is immaterial. Because Doctors Hospital closed on August 28, 1992, Lifeline could not have treated GM employees there even if it wanted to.

This argument of defendants seems to apply more to a question of whether plaintiff suffered any harm rather than whether plaintiff relied on defendants' representations. Nonetheless, construing all allegations of the complaint most favorably to the nonmoving party, I must assume that because of defendants' statements, plaintiff Lifeline did not oppose in bankruptcy court the rejection of its contract with Doctors Hospital. *See Dugan v. Brooks,* 818 F.2d 513 (6th Cir. 1987). For purposes of this motion, I must also assume that had plaintiff opposed the rejection of its contract with Doctors Hospital, the contract would not have been rejected. Thus, plaintiff would have continued to do business with Doctors Hospital from July 23, 1992, (the day the Lifeline/Doctors Hospital contract was rejected) until at least August 28, 1992 (the day Doctors Hospital closed). For purposes of this motion, I must also hypothesize that had plaintiff continued to do business with Doctors Hospital, Doctors Hospital might not have even closed on August 28, 1992; this is because 90% of Doctors Hospital's income stemmed from Lifeline. Thus, contrary to defendants' assertions, plaintiff's allegation that Lifeline would have remained at Doctors Hospital and continued to earn some income there, had defendants not made their alleged promise, is highly relevant.

Because I must view plaintiff's allegations in a light most favorable to it, for purposes of this motion I determine that there was reliance by plaintiff on statements allegedly made by defendants.

### 3. *Promisors' Reasonable Expectation*

■ Defendants argue plaintiff's promissory estoppel claim is legally deficient because it fails to allege any facts which would support a finding that defendants knew or could have expected Lifeline to take any action of a definite and substantial character based on the purported promise. However, I believe a reasonable fact finder could determine that defendants should have expected reliance by Lifeline. Defendants knew: Lifeline was treating GM employees at Doctors Hospital, Doctors Hospital was in bankruptcy, and Lifeline had a program at MHC. The evidence could suggest to a reasonable fact finder that defendants anticipated Lifeline was desiring to leave Doctors Hospital and that Lifeline took advantage of the opportunity to completely desert Doctors Hospitals once defendants made their alleged statements. Defendants knew that once Lifeline left Doctors Hospital it would be unable to

treat beneficiaries of the GM plan unless defendants kept their promise to give MHC contract provider status. Thus, whether the defendants/alleged promisors should have expected reliance by plaintiff is a question I can not answer on this motion to dismiss.

### 4. Injustice

■ Plaintiff claims it has suffered injustice by defendants reneging on their promise allegedly made to plaintiff. Plaintiff says such reneging has cost it lost income of $4,050.00 per day. Given such allegations as well as my above statements, I am unable to say as a matter of law that plaintiff has suffered no injustice; a jury must decide this issue.

### B. Fraudulent Misrepresentation

The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Kassab v. Michigan Basic Property Insur. Assoc.*, 441 Mich. 433, 442, 491 N.W.2d 545 (1992).

### 1. Present Intention

Defendants argue that "[f]uture promises are contractual and do not constitute fraud." *Hi–Way Motor Company v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976). *See also State Bank of Standish v. Curry*, 190 Mich.App. 616, 623, 476 N.W.2d 635 (1991), *affirmed in part and reversed in part*, 442 Mich. 76, 500 N.W.2d 104 (1993); *Michigan National Bank of Detroit v. Holland–Dozier–Holland Sound Studios*, 73 Mich.App. 12, 250 N.W.2d 532 (1976); *Roy Annett, Inc. v. Kerezsy*, 336 Mich. 169, 172, 57 N.W.2d 483, 485 (1953). Other courts have held: "fraud may be predicated on a promise accompanied by present intention not to perform it and made for the purpose of deceiving the promisee and induc-

ing him to act where otherwise he would not have done so." *Dixon v. Dixon*, 16 Mich. App. 42, 46, 167 N.W.2d 474 (1969). *See also Zahra v. Charles*, 639 F.Supp. 1405, 1407 (E.D.Mich.1986); *Thompson v. Paasche*, 950 F.2d 306, 312 (6th Cir.1991); *Higgins v. Lawrence*, 107 Mich.App. 178, 185, 309 N.W.2d 194 (1981); and *Van Marter v. American Fidelity Fire Insurance Co.*, 114 Mich.App. 171, 184, 318 N.W.2d 679 (1982).

■ It appears that the general rule is that promises to render future performance are normally considered contractual in nature and may not serve as the basis of a claim of fraudulent misrepresentation. A narrow exception exists, though, when a promise is made without a present intention of performance and when the promise is given for the purpose of deceiving the promisee and influencing his/her conduct. *Connellan v. Himelhoch*, 506 F.Supp. 1290, 1296 (E.D.Mich.1981).

■ Defendants argue that even under this narrow exception, plaintiff has no evidence to support its claim that Kinville was uttering a falsehood when he made the statement. Its sole evidence is that three months later when Doctors Hospital closed, MHC did not receive a contract. Defendants say that they had an intent to keep the promise when it was made but that an over-bedding problem in Detroit resulted between May and August 1992, which caused them to renege on their promise. Plaintiff argues that during this three-month period there was no over-bedding problem in Detroit because both Doctors Hospital and Detroit Osteopathic Hospital closed, thereby decreasing the number of available beds. Alternatively, argues plaintiff, in Butler's letter to Kinville, discussed above, Butler said that defendants would not approve the Lifeline program at MHC until Doctors Hospital closed because of a perceived network of over-bedding problems that would only be alleviated by the closing of Doctors Hospital. Thus, says plaintiff, if an over-bedding problem did exist, defendants probably were aware of it at the time the promise was made.

Such allegations could suggest, then, to a reasonable fact finder that defendants made

a promise without a present intention to keep it. On a motion to dismiss, I must assume as true plaintiff's allegation that Kinville had a present intent not to keep the alleged promise when he made it.

### 2. Other Elements

As discussed in the prior section, defendants contend plaintiff has failed to assert and to demonstrate the requisite reasonable and justifiable reliance and can not show that the statement was made with the intention that it be acted upon. In the above section, I stated that elements in this case, such as a definite promise, reasonable reliance, and reasonable expectation by the promisors, are for a jury to decide. The same is true for this fraudulent misrepresentation claim. Accordingly, as a matter of law, plaintiff's fraudulent misrepresentation claim states a claim upon which relief could be granted.

### C. ERISA

Last, defendants argue that plaintiff's claims of promissory estoppel and fraudulent misrepresentation are pre-empted by section 514(a) of ERISA, 29 U.S.C. § 1144(a). However, in my March 15, 1993, Opinion and Order, I held ERISA is not involved in this action. *See Lifeline Limited No. II v. Connecticut General Life Insurance Co.,* 821 F.Supp. 1201 (E.D.Mich.1993).

### Conclusion

As a matter of law, plaintiff's claims of promissory estoppel and fraudulent misrepresentation state claims upon which relief can be granted. Therefore, Defendants' motion to dismiss Second Amended Complaint, filed May 10, 1993, is DENIED.

IT IS SO ORDERED.